**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, 1101 K Street, N.W., Suite 201 Washington, DC 20005, <br><br> AMERICAN HISTORICAL ASSOCIATION, 400 A Street, S.E. Washington, DC 20003, <br><br> SOCIETY FOR HISTORIANS OF AMERICAN FOREIGN RELATIONS, Department of History Middle Tennessee State University 1301 East Main Street, Box 23 Murfreesboro, TN 37132, <br><br>          Plaintiffs, <br><br>          v. <br><br> NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, 700 Pennsylvania Avenue, N.W. Washington, DC 20408, <br><br> DAVID S. FERRIERO, in his official capacity as Archivist of the United States, 700 Pennsylvania Avenue, N.W. Washington, DC 20408, <br><br> U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, 500 12th Street, S.W. Washington, DC 20536, <br><br> MATTHEW T. ALBENCE, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement, 500 12th Street, S.W. Washington, DC 20536, <br><br>          Defendants. | Civil Action No. _____ |

**<u>COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF</u>**

Plaintiffs Citizens for Responsibility and Ethics in Washington ("CREW"), the American

Historical Association ("AHA"), and the Society for Historians of American Foreign Relations

("SHAFR") bring this action for injunctive and declaratory relief against Defendants the

National Archives and Records Administration ("NARA"), David S. Ferriero, in his official

capacity as Archivist of the United States (the "Archivist"), U.S. Immigration and Customs

Enforcement ("ICE"), and Matthew T. Albence, in his official capacity as Acting Director of

ICE, under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701, *et seq.*, the Federal

Records Act, 44 U.S.C. §§ 3301, *et seq.* ("FRA"), and the Declaratory Judgment Act, 28 U.S.C.

§§ 2201, *et seq.*, alleging as follows:

## INTRODUCTION

1.     This action challenges NARA's approval of ICE's records disposition schedule

for Detainee Records (Schedule No. DAA-0567-2015-0013) as arbitrary, capricious, and

contrary to law.  That schedule authorizes ICE to destroy, as early as this year, several categories

of records documenting mistreatment of individuals detained in ICE custody, including records

of detainee deaths, sexual assault and abuse, civil rights violations, inhumane solitary

confinement practices, and violations of ICE detention standards.

2.     Agencies cannot destroy federal records without NARA's approval.  To get

approval, an agency may submit to NARA a schedule of records it proposes to discard on a

specified timetable, 44 U.S.C. § 3303(3), which NARA can approve only if it determines that the

records "do not, or will not after the lapse of the period specified, have sufficient administrative,

legal, research, or other value to warrant their continued preservation by the Government," *id.* §

3303a(a).  NARA must then provide the public notice and an opportunity to comment on the

proposed schedule.  *Id.*  Once NARA approves a schedule, disposal of records pursuant to that

schedule "shall be mandatory."  *Id.* § 3303a(b).  "If the Archivist errs in authorizing disposal,

therefore, valuable federal records could be lost forever."  *Pub. Citizen v. Carlin*, 184 F.3d 900,

902 (D.C. Cir. 1999).

3.      At issue here is ICE's proposed disposition schedule for Detainee Records (the

"ICE Schedule").  NARA approved the ICE Schedule in December 2019, amid reports of

widespread mistreatment and abuse of ICE detainees.  Given this troubling backdrop, it should

come as no surprise that ICE's proposed schedule provoked intense public outcry.  NARA

received a record-setting number of public comments—over 23,000—objecting to the schedule.

Commenters ranging from members of Congress, historians, academic researchers, archivists,

and immigrant advocates raised a host of concerns, including that the records slated for

destruction provide critical evidence necessary to evaluate our immigration enforcement system,

both now and in the future.  Although NARA made some changes in response to these

comments, the final schedule it approved leaves many of the most problematic items in place.

4.      NARA's determination that the ICE records lack "sufficient administrative, legal,

research, or other value to warrant their continued preservation by the Government" was

arbitrary, capricious, and contrary to law.  Specifically, NARA failed to sufficiently evaluate

statutory criteria, failed to address many significant and relevant public comments, disregarded

the agency's own policies, failed to consider important aspects of the problem before the agency,

relied on factors Congress did not intend it to consider, and otherwise failed to examine the

relevant data and articulate a satisfactory explanation for its action.  Chief among these errors

was NARA's overall failure to meaningfully assess the research and historical value of the ICE

records in accordance with the FRA and its own policies.  While the agency was inundated with comments stressing that these records have high long-term research value because they document a pivotal moment in U.S. immigration policy of substantial public interest, NARA largely ignored those concerns.  It instead issued a short-sighted explanation wholly divorced from social and historical context, contrary to the agency's statutory duties.  For all these reasons, NARA's approval of the ICE Schedule must be set aside under the APA.

5.      Plaintiffs AHA and SHAFR are associations whose members include historians, researchers, and educators focused on U.S. immigration issues.  They routinely seek and use the types of records ICE plans to destroy as part of their academic research and educational work, and intend to use the ICE records well beyond the temporary retention periods set forth in the ICE Schedule, some of which are as short as three and seven years.  Similarly, Plaintiff CREW frequently requests ICE records through the Freedom of Information Act ("FOIA"); widely disseminates those records to the public; and utilizes them in reports, complaints, blog posts, and other public releases.  CREW has several pending FOIA requests for ICE records, including records slated for destruction under the ICE Schedule, and intends to submit similar requests to ICE in the future.  All Plaintiffs will therefore be irreparably harmed by any destruction of records pursuant to the ICE Schedule.

6.      Plaintiffs are also entitled to immediate injunctive relief requiring NARA to temporarily withdraw its disposal authorization, and prohibiting ICE from destroying any records pursuant to the ICE Schedule, pending resolution of this case.  There is an imminent need for such relief because, as noted, the ICE Schedule includes retention periods as short as three and seven years for some records, meaning ICE will begin destroying those records this year and,

4

indeed, may have already done so.  While this records destruction will result in an irretrievable

loss of information that will irreparably harm Plaintiffs, Defendants would suffer no harm from

merely having to preserve the records until this litigation concludes.

## JURISDICTION AND VENUE

7.      This action arises under the APA, 5 U.S.C. §§ 701, *et seq.*, the FRA, 44 U.S.C. §§

3301, *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*  This Court has

personal and subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (action

arising under the laws of the United States).

8.      Venue lies in this district pursuant to 28 U.S.C. § 1391(e).

## PARTIES

9.      Plaintiff CREW is a non-profit, non-partisan organization organized under section

501(c)(3) of the Internal Revenue Code.  CREW is committed to protecting the rights of citizens

to be informed about the activities of government officials and agencies, and to ensuring the

integrity of government officials and agencies.  CREW seeks to empower citizens to have an

influential voice in government decisions and in the government decision-making process

through the dissemination of information about public officials and their actions.  To further its

mission of promoting government transparency and accountability, CREW routinely files FOIA

requests (including with DHS, ICE, and other agencies); disseminates the documents it receives

through FOIA requests on its website, www.citizensforethics.org, and social media; and uses the

documents as the basis for reports, complaints, litigation, blog posts, and other publications

widely disseminated to the public.  Given its status as a frequent FOIA requester, CREW has a

strong operational interest in agencies' compliance with their recordkeeping obligations under

the FRA.  The destruction of federal records relevant to CREW's work thwarts its mission and impedes its informational rights under FOIA.

10.     Plaintiff AHA is a nonprofit membership organization founded in 1884 and incorporated by Congress in 1889 for the promotion of historical studies.  AHA is a trusted voice that advocates for history education, works to sustain and enhance the professional work of historians, and promotes the critical role of historical thinking in public life.  As the largest organization of professional historians in the world, AHA represents more than 12,000 members and serves historians representing every historical period and geographical area in a wide variety of professions.  AHA's journal, the *American Historical Review*, is the most widely read and cited professional historical journal in the world.

11.     Plaintiff SHAFR is a professional society dedicated to the study of U.S. foreign relations.  On behalf of its nearly 1,000 members, it advances its mission to promote the study, advancement and dissemination of knowledge about U.S. foreign policy by awarding research grants and prizes, holding conferences, publishing an academic journal, *Diplomatic History*, and furthering archival access to government documents.

12.     Members of AHA and SHAFR include historians, researchers, and educators who depend on preservation of and access to federal records in order to present a full and accurate accounting of the past in their teaching, public speaking, exhibitions, publications, and research endeavors.  These members routinely rely on permanent federal records stored at NARA facilities, and have filed thousands of FOIA and mandatory declassification review requests (including with ICE and its predecessor agencies).  Both AHA and SHAFR have long advocated for the preservation, declassification, and public availability of federal records, because of the

fundamental importance of these records for their investigation of the country's past. Thus, AHA and SHAFR members have a strong interest in federal agencies' compliance with their recordkeeping obligations under the FRA. The destruction of federal records relevant to their members' work thwarts the organizations' missions and impedes their members' informational rights under FOIA.

13.     Defendant NARA is an agency within the meaning of the APA, 5 U.S.C. § 551(1), and the FRA, 44 U.S.C. § 2901(14). NARA operates under the supervision and direction of the Archivist of the United States.

14.     Defendant David S. Ferriero is the Archivist of the United States and is sued in his official capacity only.

15.     Defendant ICE is an agency within the meaning of the APA, 5 U.S.C. § 551(1), and the FRA, 44 U.S.C. § 2901(14). ICE operates under the supervision and direction of the ICE Director.

16.     Defendant Matthew T. Albence is the Acting Director of ICE and is sued in his official capacity only.

## LEGAL FRAMEWORK

### I.     The Federal Records Act and Records Disposal Act

17.     The FRA is a collection of statutes governing the creation, management, and disposal of federal records. *See* 44 U.S.C. §§ 2101, *et seq.*; §§ 2901, *et seq.*; §§ 3101, *et seq.*; and §§ 3301, *et seq.* It ensures the "[a]ccurate and complete documentation of the policies and transactions of the Federal Government." 44 U.S.C. § 2902.

18.     NARA and agency heads share responsibility to ensure that an accurate and complete record of agencies' policies and transactions is compiled and preserved. *See* 44 U.S.C. §§ 2901, *et seq.*; *id.* §§ 3101, *et seq.*

19.     NARA must "provide guidance and assistance to Federal agencies" and "promulgate standards, procedures, and guidelines with respect to records management and the conduct of records management studies." 44 U.S.C. § 2904. NARA has promulgated regulations governing the creation and maintenance of federal records pursuant to this authority. *See* 36 C.F.R. §§ 1222.22, *et seq.*

20.     The FRA directs that agencies "shall make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency and designed to furnish the information necessary to protect the legal and financial rights of the Government and of persons directly affected by the agency's activities." 44 U.S.C. § 3101.

21.     The Records Disposal Act ("RDA") is the portion of the FRA governing the disposal of federal records. *See* 44 U.S.C. §§ 3301, *et. seq.* It establishes the "exclusive . . . procedures" by which federal records may be destroyed. 44 U.S.C. § 3314.

22.     The RDA requires an agency to get NARA's approval before disposing of any record. To get approval, an agency may submit to NARA a schedule of records it proposes to destroy on a specified timetable, 44 U.S.C. § 3303(3), which NARA can approve only if it determines that the records "do not, or will not after the lapse of the period specified, have sufficient administrative, legal, research, or other value to warrant their continued preservation by the Government," *id.* § 3303a(a).

8

23.     Before approving a records disposition schedule, NARA must publish a "notice in the Federal Register" of the proposed schedule and provide "an opportunity for interested persons to submit comment thereon."  44 U.S.C. § 3303a(a).  According to NARA, "[s]uch public comment is integral to the scheduling and appraisal process."  Ex. 1 at 1.

24.     Once NARA approves a schedule, disposal of records pursuant to that schedule "shall be mandatory."  *Id.* § 3303a(b).  "If the Archivist errs in authorizing disposal, therefore, valuable federal records could be lost forever."  *Pub. Citizen*, 184 F.3d at 902.

25.     Thus, under the statutory scheme, both the originating agency and NARA share responsibilities in establishing records disposition schedules: the agency "has the duties to preserve certain record information under § 3101 and to propose the disposal of records in conformity with the requirements of § 3303," while NARA "has the statutory responsibility to subject the [agency's] proposed disposal schedules to critical scrutiny to ascertain whether they are in accord with the statutory standards of §§ 3101, 3303a."  *Am. Friends Serv. Comm. v. Webster*, 720 F.2d 29, 68 (D.C. Cir. 1983).

26.     NARA has issued guidelines and directives for determining whether records have sufficient value to warrant permanent retention under § 3303a(a)—a process NARA refers to as "appraisal."  Chief among these is NARA's Appraisal Policy, which "sets out the strategic framework, objectives, and guidelines that [NARA] uses to determine whether Federal records have archival value," and "provides more specific guidelines for appraising certain categories of records."  NARA, Strategic Directions: Appraisal Policy, Sept. 2007, *available at* https://bit.ly/2HM7YZQ ("Appraisal Policy").

27.     NARA has also issued guidelines that provide examples of record series "commonly appraised as permanent," which it instructs "[r]ecords officers [to] use . . . as guides to help identify permanent records."  NARA, Examples of Series Commonly Appraised as Permanent, *available at* https://bit.ly/39VaIjO.

28.     The FRA provides that NARA "may empower a Federal agency to retain records for a longer period than that specified in disposal schedules, and may withdraw disposal authorizations covering records listed in disposal schedules."  44 U.S.C. § 2909.  The implementing regulations further provide that NARA will "withdraw disposal authorizations in approved schedules" where "required to ensure the preservation of Government records, or when required by an emergency, or to maintain efficiency of Government operations."  36 C.F.R. § 1226.16(a).  "To both impose and rescind the withdrawal, NARA will notify the affected agency or agencies in writing, either by letter or NARA bulletin."  *Id.* § 1226.16(b).

## II.     The Administrative Procedure Act

29.     The APA provides that a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.

30.     The term "agency action" includes "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).

31.     A court reviewing a claim under 5 U.S.C. § 702 "shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."  5 U.S.C. § 706.  The reviewing court shall "hold

unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

32.     Section 706(2)(A) of the APA authorizes judicial review of NARA's approval of an agency's records disposition schedule under the RDA.  *See Webster*, 720 F.2d at 38-46; *Pub. Citizen v. Carlin*, 2 F. Supp. 2d 1, 9 (D.D.C. 1997), *rev'd on other grounds*, 184 F.3d 900 (D.C. Cir. 1999); *Green v. NARA*, 992 F. Supp. 811, 818 (E.D. Va. 1998).  Judicial review in such cases fulfills "an important need by ensuring that" NARA and the agency proposing the schedule do "not overlook" private parties' "interests when applying the statutory standards on records disposal and preservation." *Webster*, 720 F.2d at 45.

## FACTS

**I.     ICE's Troubling History of Detainee Mistreatment and Abuse**

33.     A relatively new agency, ICE was created in 2003 as a component of the Department Homeland Security ("DHS").  ICE merged the investigative and interior enforcement elements of the former U.S. Customs Service and the Immigration and Naturalization Service ("INS").

34.     ICE's Enforcement and Removal Operations directorate ("ERO") manages all aspects of the immigration enforcement process, including identification and arrest, domestic transportation, detention, bond management, and supervised release.  ERO oversees the detention of immigrants in nearly 200 ICE facilities.

35.     ICE detainees are held in civil, not criminal, custody, which is "not supposed to be punitive."  DHS Office of Inspector General ("OIG") Report, <u>Concerns About ICE Detainee Treatment and Care at Four Detention Facilities</u>, OIG-19-47, at 2, June 3, 2019, *available at*

https://bit.ly/37L2k4Y.  ICE has adopted standards intended to establish consistent conditions of confinement, program operations, and management expectations within ICE's detention system. *Id.* at 2.  These detention standards include requirements for environmental health and safety (e.g., cleanliness, sanitation, security, detainee searches, segregation,[1] and disciplinary systems); detainee care (e.g., food service, medical care, and personal hygiene); activities (e.g., visitation and recreation); and grievance systems.  *Id.*

36.     Over the past several years, cases of detainee mistreatment and abuse have been rampant at ICE.  This is an issue of intense and ongoing public interest, with the DHS OIG, members of Congress, whistleblowers, academic researchers, and immigrant advocates repeatedly sounding the alarm.  For example:

a.     An April 2017 complaint by watchdog group Community Initiatives for Visiting Immigrants in Confinement ("CIVIC") (now called Freedom for Immigrants) found, based on records obtained through FOIA, over 14,600 reported incidents of sexual and physical abuse in ICE detention centers from 2010 to 2016, with less than 2 percent of those reports resulting in OIG investigations.  Rebecca Merton and Christina Fialho, Complaint re: Sexual Abuse, Assault, and Harassment in U.S. Immigration Detention Facilities, *CIVIC*, at 4, Apr. 11, 2017, *available at* https://bit.ly/32qEYAF.  CIVIC further found that "[m]ore complaints were submitted against ICE than any other DHS component."  *Id.*

---

[1] Segregation is the process of separating detainees from the general population for purported administrative, disciplinary, or protective reasons.

b.  A December 2017 DHS OIG report noted that "inspections of five detention

facilities raised concerns about the treatment and care of ICE detainees at four of

the facilities visited," including "problems that undermine the protection of

detainees' rights, their humane treatment, and the provision of a safe and healthy

environment."  DHS OIG Report, <u>Concerns about ICE Detainee Treatment and</u>

<u>Care at Detention Facilities</u>, OIG-18-32, at 1, Dec. 11, 2017, *available at*

<u>https://bit.ly/2wzaoZr</u>.  Specifically, the OIG found that "detainees were housed

incorrectly based on their criminal history," "all detainees entering one facility

were strip searched," "[s]ome facility staff reportedly deterred detainees from

filing grievances and did not thoroughly document resolution of grievances,"

"some facilities may have misused segregation," and others had "potentially

unsafe and unhealthy detention conditions."  *Id.*

c.  A May 2018 analysis by the Center for American Progress found, based on data

provided by ICE, that LGBT immigrants are 97 times more likely to be sexually

assaulted than other detainees, and that ICE's response to this problem has been to

segregate LGBT immigrants into solitary confinement—a practice the United

Nations deems a form of torture.  Sharita Gruberg, <u>ICE's Rejection of Its Own</u>

<u>Rules Is Placing LGBT Immigrants at Severe Risk of Sexual Abuse</u>, *Ctr. for Am.*

*Progress*, May 30, 2018, *available at* <u>https://ampr.gs/2VctsHu</u>.

d.  A June 2018 DHS OIG report found that ICE's "inspections, follow-up processes,

and onsite monitoring of" detention facilities "do not ensure adequate oversight or

systemic improvements in detention conditions, with some deficiencies remaining

unaddressed for years."  DHS OIG Report, <u>ICE's Inspections and Monitoring of</u>
<u>Detention Facilities Do Not Lead to Sustained Compliance or Systemic</u>
<u>Improvements</u>, OIG-18-67, at 1, June 26, 2018, *available at*
<u>https://bit.ly/2wFEfj5</u>.

e.  A March 2019 memo from DHS's Office for Civil Rights and Civil Liberties
("CRCL") to ICE leadership described claims, made by an ICE whistleblower,
that the agency had "systematically provided inadequate medical and mental
health care oversight to immigration detainees in facilities throughout the U.S."
CRCL Memo, at 1, Mar. 20, 2019, *available at* <u>https://bit.ly/2Peo178</u>.  The memo
details the cases of 17 detainees from nine ICE facilities across six states.  *Id.*

f.  A June 2019 DHS OIG report found "immediate risks or egregious violations of
detention standards at [ICE] facilities in Adelanto, CA, and Essex County, NJ,
including nooses in detainee cells, overly restrictive segregation, inadequate
medical care, unreported security incidents, and significant food safety issues."
DHS OIG Report, <u>Concerns About ICE Detainee Treatment and Care at Four</u>
<u>Detention Facilities</u>, OIG-19-47, at 1, June 3, 2019, *available at*
<u>https://bit.ly/37L2k4Y</u>.  The OIG's "observations confirmed concerns identified
in detainee grievances, which indicated unsafe and unhealthy conditions to
varying degrees at all of the facilities we visited."  *Id.* at 3.

37.  Reports show that these problems have been exacerbated under the Trump
Administration.  By making aggressive immigration enforcement a central policy priority, the
administration has drastically increased the number of individuals in ICE detention, with the

detained population reaching record highs.  At the same time, it has taken steps to weaken immigration detention standards, including by no longer requiring facilities to maintain certain health care accreditations, downgrading health assessment standards, and broadening allowable use-of-force techniques and solitary confinement practices.  *See* ICE, 2019 National Detention Standards for Non-Dedicated Facilities, *available at* https://bit.ly/2SZWYhS.

## II.    ICE's Proposed Records Disposition Schedule and NARA's Approval Process

38.    On October 26, 2015, ICE submitted to NARA a proposed records disposition schedule for "Detainee Records" (Schedule No. DAA-0567-2015-0013).  That iteration of the schedule proposed destroying, on varying timetables, eleven categories of records: (1) detainee sexual abuse and assault files; (2) death review files; (3) detainee telephone rate records; (4) weekly detention service monitor reports; (5) alternative to detention records; (6) alternative to detention emergency/incident records; (7) detainee escape reports; (8) Detention Reporting and Information  Line ("DRIL Hotline") records; (9) detention segregation case files; (10) daily detention log; and (11) residential detainee locator files.

39.    On June 20, 2017, a NARA appraiser recommended that NARA approve ICE's proposed schedule.  Ex. 2 at 1.  The appraiser found, among other things, that "[r]ecords relating to incidents of sexual assault at ICE facilities" and "records of deaths of detainees in ICE custody" (including related findings of violations of detention standards by ICE officials) did "not document significant actions of Federal officials" and thus did not warrant permanent retention.  *Id.* at 1-2.  The appraiser further found that detainee death records, reports filed by Detention Service Monitors providing oversight of ICE's largest facilities, and records

15

documenting detainees' placement in solitary confinement all had "little or no research value." *Id.* at 2-4.

40.     On July 14, 2017, NARA invited public comment on the proposed ICE Schedule through a notice in the Federal Register.  82 Fed. Reg. 32,585.

41.     The proposed schedule provoked significant backlash, generating over 23,000 public comments—a record high for NARA.  The comments included "three congressional letters with a total of 36 signatures; a petition from the American Civil Liberties Union with 23,758 comments; a petition from UltraViolet with 1,475 signatures; written comments from 187 individuals and six organizations; and phone calls from seven individuals." Ex. 1 at 2.

42.     The commenters "overwhelmingly asked NARA not to approve the disposition request entirely; not to approve the request to destroy records related to death, abuse, and detainee segregation; or to preserve all records on the pending record schedules." *Id.*  "Many commenters stated that the records are needed for oversight, accountability, transparency, and program improvement; for identifying trends over time in abuse, death, or use of solitary confinement; for investigations of mismanagement at ICE; for use in designing safe and effective detention facilities; for sociologists and psychologists researching social problems; for crafting future legislation; for historical research into treatment of detainees and conditions of detention; and for understanding immigration and border security issues." *Id.*  Other "commenters held that preservation of the records was necessary because of ongoing litigation, or to protect individuals' rights and ability to seek legal redress or to qualify for certain benefits." *Id.*

43.     Following this first round of public comments, NARA appraisal staff worked with ICE on revising the schedule.  On September 12, 2018, the NARA appraiser issued a memo

16

recommending that NARA approve the schedule with certain modifications.  Ex. 3.  ICE adopted

NARA's changes effective October 25, 2018.  Ex. 4.  As modified, the proposed ICE Schedule

included six items with temporary retention periods: (1) detainee sexual abuse and assault files;

(2) ERO detainee death review files; (3) detention monitoring reports; (4) detainee escape

reports; (5) DRIL Hotline records; and (6) detainee segregation reports.  *Id.* at 1-2; Ex. 3 at 2-8.

44.    On June 21, 2019, NARA published a consolidated reply to public comments on

the proposed ICE Schedule.  84 Fed. Reg. 29,247; Ex. 1 at 2.  NARA's reply purported to

summarize the public comments and how NARA revised the schedule in response.  NARA also

invited, a received, a second round of public comments on the proposed ICE Schedule.  84 Fed.

Reg. 29,247.

45.    On December 11, 2019, the Archivist approved the proposed ICE Schedule.  Ex.

5 at 10.  The next day, NARA issued a final consolidated reply to public comments.  Ex. 6.

NARA noted that it did not require ICE to revise the schedule following the second round of

comments.  *Id.* at 2.

46.    NARA's final consolidated reply stated that "[a]ll comments received during the

public comment period were considered and are now part of the administrative record, and are

available to view" online at https://www.regulations.gov/docket?D=NARA-19-0007.  *Id.* at 1.  It

explained that the consolidated reply "summarizes public comments submitted, and a discussion

of the proposed records schedule."  *Id.*

47.    As approved by NARA, the final ICE Schedule requires destruction of six

categories of records per the specified retention periods:

a.  **Detainee Sexual Abuse and Assault Files (25-year retention period).**  These

are "[r]ecords documenting the reporting and investigation of sexual abuse or

assault allegations between detainees as well as by employees, contractors,

or volunteers against detainees," including without limitation "police reports;

summaries of medical exam results; supporting memos and video (if any);

evidentiary materials pertaining to the allegation; and investigation outcomes."

Ex. 5 at 3.  They must be destroyed 25 years after "the end of the fiscal year in

which the case is closed."  *Id.*

b.  **ERO Detainee Death Review Files (20-year retention period).**  These are

"[r]ecords documenting [ERO] reporting of detainee deaths that occur in ICE

custody, including detention facilities, medical facilities, or in transit to or from

any such facility," including without limitation "correspondence; medical reports;

investigative reports; detainee's detention and medical files; death certificates;

toxicology reports; and autopsy reports."  *Id.* at 3.  They must be destroyed 20

years after "the end of the fiscal year in which the case is closed."  *Id.* at 4.

c.  **Detainee Segregation Reports (7-year retention period).**  These are "[r]eports

documenting the placement of detainees in segregated housing" —i.e., solitary

confinement—"including reasons for segregation placement, compliance with

applicable detention standards, alternative arrangements explored, and assessment

of the best course of action."  *Id.* at 7.  "Segregation may be administrative,

disciplinary, protective actions, or self-requested by the detainee."  *Id.*  Records

must be destroyed seven years after the end of the "fiscal year in which the

detainee is released from segregation." *Id.* at 8.

d. **Detention Monitoring Reports (3-year retention period).** These are weekly

reports "documenting on-site monitoring of detention facilities" filed by

Detention Service Monitors "for appropriate and timely resolution of problems

and concerns that may arise daily during facility operations," including non-

compliance with ICE detention standards. *Id.* at 6. They must be destroyed three

years after "the end of the calendar year in which the report is issued." *Id.*

e. **DRIL Hotline Records (7-year retention period).** These are records

documenting calls to the DRIL Hotline, "a toll-free service providing a direct

channel for individuals in ICE custody, the public, non-governmental

organizations, faith-based organizations, academic institutions, attorneys, and

advocacy groups to communicate directly with ICE to answer questions and

resolve concerns." *Id.* at 7. They "include, but are not limited to,

communications in any form (phone, etc.), correspondence, and supporting

documentation." *Id.* Records must be destroyed seven years after the "end of the

calendar year in which the call is received." *Id.*

f. **Detainee Escape Reports (7-year retention period).** These are "[r]eports

documenting details of successful detainee escapes from ICE custody or detention

facilities," which are "are generated from field offices and submitted to the ICE

Detention Standards Compliance Unit." *Id.* at 6. They must be destroyed seven

years after the "end of the fiscal year in which the report is issued." *Id.*

19

### III.    Deficiencies in NARA's Approval of the ICE Schedule

48.    As outlined above, NARA's explanation for its approval of the ICE Schedule is set forth in its consolidated replies to public comments issued on June 14 and December 12, 2019, Exs. 1, 6, and in its September 2018 appraisal memo, Ex. 3.  Those materials make clear that NARA's approval decision and supporting explanation were arbitrary, capricious, and contrary to law, for at least the following reasons and others that will be elucidated upon review of the complete administrative record:

### A.    Overall Failure to Meaningfully Evaluate Research and Historical Value

49.    Chief among NARA's errors was its overall failure to meaningfully evaluate the research and historical value of all six categories of records scheduled for destruction, as required by the RDA and NARA's own Appraisal Policy.

50.    Before authorizing a destruction of records, NARA must determine that the records lack "sufficient administrative, legal, *research, or other value* to warrant their continued preservation by the Government."  44 U.S.C. § 3303a(a) (emphasis added).  NARA's Appraisal Policy, in turn, stresses that "records appraisal . . . requires . . . knowledge of and sensitivity to researchers' interests," and a "willingness to acknowledge and understand comments and suggestions from diverse perspectives."  *Id.*  Thus, the policy instructs that "it is important to consider" the "future research potential of records . . . in making appraisal decisions," and that "[i]t is necessary to consider the kinds and extent of current research use and to try to make inferences about anticipated use both by the public and by the Government."  Appraisal Policy, https://bit.ly/3a4mnNh.  It adds that "[t]he significance of the functions and activities performed by the originating agency . . . and the business context within which the records are created are

important considerations for the appraiser." *Id.*  Applying these principles, NARA will "identify

for permanent retention records" that "[p]rovide evidence of Federal . . . actions relating to major

social . . . issues," and "evidence of the significant effects of Federal programs and actions on

individuals" and "communities." *Id.*

51.     NARA failed to adequately consider and explain its application of these factors in

approving the ICE Schedule.  NARA was inundated with an unprecedented number of public

comments—including from members of Plaintiffs AHA and SHAFR, and AHA itself—stressing

that ICE's detention records have substantial long-term research value because, among other

things, they document a pivotal moment in U.S. immigration policy of intense public interest.

But NARA's approval decision largely ignored those concerns.  NARA instead issued a short-

sighted explanation wholly divorced from social and historical context, contrary to its statutory

duties.  NARA treated ICE as if it were any other agency, without regard to the "significance of

the functions and activities performed by the originating agency," or the "major social . . .

issues" implicated by ICE's widely condemned detention practices.  Appraisal Policy,

https://bit.ly/3a4mnNh.

52.     Rather than demonstrating a sensitivity to researcher and historian interests,

NARA's decision reflects an attitude of indifference.  For example, in its final consolidated

reply, NARA summarized commenters' concerns that "sufficient records will not be available

for historical and human rights research," which drew parallels between ICE's inhumane

detention practices and historical atrocities perpetrated by the Federal Government in the mid-

twentieth century.  Ex. 6 at 2-4.  Yet NARA's response to those comments reflects no serious

effort to "consider the kinds and extent of current research use and to try to make inferences

about anticipated use."  Appraisal Policy, https://bit.ly/3a4mnNh.  Instead, NARA summarily

stated that "the anticipated research use will be more contemporary rather than many years into

the future," with no supporting analysis.  Ex. 6 at 4.

53.    Similarly, NARA grossly misapprehended the research value of two categories of

records—detainee segregation reports and DRIL Hotline records—characterizing them as merely

involving "decisions of lower-level federal officials about operational matters."  *Id.*  To the

contrary, detainee segregation reports include historically valuable proof of ICE's *recurring* use

of inhumane solitary confinement practices, which DHS's own OIG has cited ICE for abusing

repeatedly.  *See supra* ¶ 36.  At least one commenter specifically flagged this concern for

NARA, explaining that segregation reports have "historical value . . . in terms of broader

accountability and understanding as they document the uses of solitary confinement in ICE

detention, which the United Nations calls a form of torture" when used based on a detainee's

LGBT status.  Public Comment of J. Patino, NARA-19-0007-0057 (July 31, 2019), *available at*

https://bit.ly/2Tmzr9S.  The same commenter cited statements of a DHS whistleblower attesting

that the practice has "been used widely and abusively in violation of DHS policies," and attached

an analysis by the Center for American Progress finding that transgender people were

disproportionately subjected to it.  *Id.*  The commenter cogently explained that "[b]ecause of

their essential long term historical value in documenting these violations and the treatment of

detainees, especially those who are uniquely vulnerable due to disability or LGBTQ status in this

dark period of our national history, it is vital that these records be given a permanent disposition.

They are as equally important in telling future generations about what was done in our name as"

other categories of ICE records NARA appraised as permanent.  *Id.*  NARA failed altogether to address these concerns.

54.     Equally off the mark was NARA's characterization of the DRIL Hotline records. As NARA itself acknowledged elsewhere, these records document "incidents of sexual or physical assault or abuse; serious or unresolved problems in detention; [and] reports of victims of human trafficking;" as well as how ICE telephone operators "assist[ed] with resolution" of those complaints.  Ex. 1 at 8.  To say these records merely involve "decisions of lower-level federal officials about operational matters," Ex. 6 at 4, borders on unconscionable and, at minimum, was arbitrary and capricious.

55.     NARA also blithely dismissed commenters' comparisons of ICE detention to the internment of Japanese-Americans during World War II, stating that "[w]hile ICE detains aliens on the basis of immigration status, Japanese internment involved the detention of U.S. citizens on the basis of ethnicity or national origin." Ex. 6 at 5.  Besides being deeply troubling, NARA's reasoning simply misses the point: commenters analogized the historical significance of ICE detention to Japanese internment because, in their view, both involve systematic mistreatment of a marginalized population that the Federal Government improperly subjected to punitive detention conditions.  NARA's dismissal of the comparison was arbitrary and capricious, because the agency offered no reasoned explanation for its view that the basis for detention or citizenship status of the detainees were material distinctions rendering the analogy inapt.

56.     Finally, NARA repeatedly noted that records appraised as temporary could be requested through FOIA, and that destruction of requested records would be forbidden while a FOIA request is pending.  Ex. 1 at 1-2; Ex. 6 at 4.  But this does nothing to address the long-term

interests of historians and researchers, such as Plaintiffs, who frequently seek records many decades after their creation—far beyond the temporary retention periods set forth in the ICE Schedule.

**B.    Failure to Address Significant and Relevant Public Comments**

57.    NARA failed altogether to address public comments raising significant, if not dispositive, concerns relevant to the agency's appraisal analysis.  These include, without limitation, the comment discussed above describing the "historical value" of detainee segregation reports.  *See* Public Comment of J. Patino (and attachment), NARA-19-0007-0057 (July 31, 2019), *available at* https://bit.ly/2Tmzr9S.

58.    NARA also failed entirely to address a major submission by research professors from Durham University.  *See* Public Comment of S. Hughes (and attachment), NARA-19-0007-0060 (Aug. 3, 2019), *available at* https://bit.ly/2wfUOSj.  Echoing Plaintiffs' concerns here, the professors highlighted the "research value for social scientists and legal scholars" of records "documenting patterns of behavior, humans rights concerns and abuse in [ICE] detention."  *Id.* They explained that the ICE records have allowed them to "identify key incidents and, most importantly, wide variation in reporting, record-keeping, and monitoring."  *Id.*  They added that the records "are already used in research and are essential to research on U.S. immigration detention facilities" and destroying them would therefore "have a demonstrable and negative impact upon academic research in this field."  *Id.*  The professors also submitted a research paper entitled "Countermapping Detention" that relies on "civil immigration detention documents" to "visualis[e] patterns of abuse."  *Id.*  This is precisely the type of relevant, unique, and well-informed comment NARA was obligated to address in approving the ICE Schedule.  It did not.

24

59.     In other instances, NARA quoted public comments but then provided a response that failed to actually address the points raised.  For example, NARA's final consolidated reply quoted a comment stressing, among other things, the historical value of the ICE records given the "growing media coverage of the mistreatment of detainees by ICE in detention facilities," which "several historians have shown . . . fit any rational definition of concentration camps." Ex. 6 at 9.  But NARA's response failed entirely to address this point.  *Id.*

**C.      Failure to Appropriately Value Primary Source Material**

60.     A recurring theme of NARA's decision was that records documenting, or qualifying as, primary sources need not be retained permanently because similar information is captured in secondary summaries or other downstream records prepared by ICE officials scheduled for permanent or "long-term temporary" retention.  But this reasoning overlooks that primary source material often has distinct research and historical value that secondary summaries lack.  As the D.C. Circuit once explained in rejecting NARA's approval of another agency's records disposition schedule, NARA's "assumption that [agency] summaries are always sufficient to maintain all information" fails to appreciate that "[i]n certain cases that invoke substantial public or historical interest, it will be valuable for researchers to examine primary source material instead of relying on secondary source summaries," and that in "some cases, summaries cannot be trusted to address all important research issues that may arise, especially when the summaries are prepared with the [agency's] objectives in mind."  *Webster*, 720 F.2d at 66 n.61.

61.     NARA employed this faulty reasoning in approving destruction of several categories of records.  For example, NARA approved destruction of sexual abuse and assault

25

files, detention monitoring reports, and detainee escape reports because "significant events" from those records would also be documented in downstream reports lodged in ICE's "Significant Event Notification System [("SEN")], a long-term temporary record whose master file is already scheduled . . . for a 75-year retention period."  Ex. 1 at 5, 7, 8.  However, "SEN's primary purpose" is not to maintain complete records sufficient to serve the long-term interests of historians and researchers, but rather to serve ICE's temporary operational needs of "disseminat[ing] information to relevant management and interdivisional personnel about events to allow them to respond by allocating appropriate resources and facilitating appropriate responses to significant events."  DHS Privacy Impact Assessment for SEN System, July 26, 2010, *available at* https://bit.ly/2uEOzHx.  NARA failed to consider this disconnect.  At any rate, even the SEN records have a temporary retention period of 75 years, and thus do not meet the needs of immigration historians, including members of Plaintiffs AHA and SHAFR, who routinely rely on source material dating back well over 100 years.

62.     Similarly, NARA approved destruction of DRIL Hotline records because "documentation of significant incidents will be captured in records specific to the type of allegation being made."  Ex. 1 at 8.  But once again, NARA disregarded that there are long-term research and accountability interests in the DRIL Hotline records themselves that would not be served by downstream "documentation of significant incidents."  Data from DRIL Hotline records have provided "valuable information related to the incidence of sexual and physical abuse in immigration detention, grievances regarding lack of access to legal counsel and basic immigration case information, and may also provide important insight regarding challenges faced by parents separated from their minor children by immigration officials."  American

26

Immigration Council, FOIA Request to ICE, at 7, 14-16, Feb. 18, 2020, *available at*

https://bit.ly/32zba4N (citing sources).  The records would also enable researchers to evaluate the

effectiveness of the DRIL Hotline itself, by allowing them to identify the incidence and nature of

complaints ICE received through the DRIL Hotline, and how ICE acted on those complaints.

That sort of analysis could not be conducted—or, at least, would be significantly impeded—

using only the downstream "documentation of significant incidents . . . in records specific to the

type of allegation being made."  Ex. 1 at 8.

63.      Several commenters raised concerns about ICE's under-valuation of primary

source records.  One commenter stated that sexual abuse and assault files and detention

monitoring reports provide "a much less mediated account of events than the 'significant event

notification system' records [NARA] suggest[s] as an alternative," and that the DRIL Hotline

records document "a broader range of perspectives on the conditions in ICE detention facilities"

originating from "outside the agency."  Ex. 6 at 8.  Another commenter, the Archivists Round

Table of Metropolitan New York, noted that "as a body of records" the DRIL Hotline records

"could be useful for studying detention practices, including the percentage of individuals

detained versus monitored, and how such decisions were made.  The DRIL records could have a

high research value as a complete data set."  *Id.*

64.      NARA dismissed these concerns, explaining that it considers "documentation of

high-level federal decision-making more archivally significant" than first-hand accounts, and

does not value "'information that came straight from the detainees' over records not 'filtered' by

the agency."  *Id.* at 9.  "On the contrary," NARA added, "complaints that proceed through

agency processes are more, not less, likely to meet criteria for permanent retention because they

reflect more thorough investigation and assessment." *Id.* But this reasoning is non-responsive to the commenters' specific concerns regarding the research and archival value of these records as primary source material. It is also incompatible with the D.C. Circuit's analysis in *Webster*, 720 F.2d at 66 n.61, discussed above.

### D.     Valuing U.S. Citizen Records Over Non-Citizen Records

65.     Another flawed premise underlying NARA's approval decision was that "records documenting matters related to citizens of other countries are less likely to be appraised as permanent than records pertaining to citizens of the United States," because NARA's Appraisal Policy "refer[s] to the status and rights of U.S. citizens." Ex. 6 at 5. Although not clear from NARA's explanation, this may have been the basis for NARA's rejection of the comparison of ICE detention to Japanese internment, discussed above. *Id.*

66.     NARA's reasoning, and the portions of the Appraisal Policy on which it relied, are arbitrary, capricious, and contrary to law, because nothing in the FRA suggests that records relating to U.S. citizens affected by the government's actions are more archivally significant than those relating to non-citizens. Rather, the FRA's core recordkeeping provision refers to records concerning "*persons* directly affected by the agency's activities," without regard to citizenship status. 44 U.S.C. § 3101 (emphasis added). Insofar as NARA concluded otherwise, it relied on a factor that Congress did not intend it to consider.

### E.     Disregarding NARA Policy on Appraisal of Records Related to Permanent Records

67.     NARA failed to consider how its appraisal of the ICE records squared with its prior appraisal decisions of related immigration records, including those appraised as permanent

based on their research and historical value.  This was contrary to NARA's own Appraisal Policy, which requires consideration of whether the records being appraised are "related to other permanent records."  Appraisal Policy, https://bit.ly/3a4mnNh.  The policy further provides that "[r]ecords that are chronological continuations of records already in the National Archives are likely to warrant permanent retention, particularly if the older segments of the records are subject to high reference use."  *Id.*

68.     Disregarding these factors, NARA overlooked that the historical predecessors of the ICE records are permanently preserved in NARA's Record Group 85, Records of the Immigration and Naturalization Service.  NARA, Record Group 85 (1787-1993), *available at* https://bit.ly/2TkHghK.  Record Group 85 includes records documenting INS's enforcement of the Chinese Exclusion Acts, records of World War I and II internment camps, and local case files from INS district offices concerning individual immigrant detainees.  *Id.*  Many of the Record Group 85 records are strikingly similar to the ICE records, including "[d]aily activity reports of immigrant inspectors," records of immigrants' "detainment," and "[i]mmigration investigation case files."  *Id.*  NARA has acknowledged that the records in Record Group 85 are "now considered priceless by historians, social scientists, and genealogists," even though they were erroneously "thought by some [in government] to have little or no future value fifty years ago." NARA San Francisco, Record Group 85, *available at* https://bit.ly/2TN7Ij9.  Yet NARA inexplicably repeated the same mistake in its appraisal of the ICE records.

## F.     Disregarding NARA Policy on Appraisal of Periodic Reports

69.     NARA also disregarded its own guidelines in approving destruction of ICE's detention monitoring reports.  NARA's appraisal guidelines list, as a type of record "normally

29

appraised by NARA for permanent" retention, "periodic reports prepared by the agency, or by private organizations or individuals under contract to the agency or in receipt of a grant from the agency."  NARA, Examples of Series Commonly Appraised as Permanent, *available at* https://bit.ly/39VaIjO.  "Regional reports prepared by field offices and forwarded to the agency's headquarters are frequently permanent because they contain information on ethnic, social, economic, or other aspects of specific localities."  *Id.*

70.     ICE's detention monitoring reports fit NARA's criteria for "periodic reports." These are "weekly reports" filed with ERO at ICE Headquarters documenting "on-site monitoring of detention facilities for appropriate and timely resolution of problems and concerns."  Ex. 5 at 6.  The reports are prepared by Detention Service Monitors, who "support oversight of ICE's largest facilities, soliciting feedback from local and regional staff."  Ex. 1 at 7. Monitors are placed in "52 [ICE] detention facilities" and serve the "program goals" of "monitor[ing] compliance with applicable detention standards, enabl[ing] 'on the spot' resolution of facility issues, ensure regular inspection checks, and enhance collaboration with ERO field offices and facility staff to address concerns."  DHS OIG Report, Concerns about ICE Detainee Treatment and Care at Detention Facilities, OIG-18-32, at 1, Dec. 14, 2017, *available at* https://bit.ly/2wzaoZr.  In approving destruction of these records, NARA failed even to acknowledge its relevant appraisal guidelines on periodic reports, let alone did it explain why it was departing from those guidelines.

### G.     Multiple Failures as to ERO Detainee Death Review Files

71.     ERO detainee death review files "typically include[] the death certificate; a memorandum of issue ERO creates for the Executive Associate Director of ERO summarizing

findings; background on the detainee and his or her arrest; the removal order statement; consular notification information; the autopsy exam report; the toxicology report; ERO's corrective action plan based on the [Office of Professional Responsibility ("OPR")] report; a copy of the Significant Incident Report (SIR) from the Significant Event Notification (SEN) System; and correspondence between ERO and the facility where the detainee died." Ex. 1 at 6. In approving destruction of these records, NARA reasoned that it had separately appraised the OPR death review files for permanent retention, and that preserving both sets of files "would be unnecessarily duplicative." Ex. 6 at 6. NARA "determined that the OPR death review files are the most informative, because they include a higher level analysis of the event by ICE investigators." *Id.* The ERO death files, NARA found, consist of "materials gathered from disparate sources that are . . . themselves mostly temporary records," except for "Alien File (A-File) materials," which are permanent. *Id.*

72.     NARA's reasoning was flawed in several respects. First, NARA failed to consider that there is immense public and research interest in *any* records concerning detainees who died in ICE custody, a point NARA elsewhere recognized in approving permanent retention of the OPR death review files. Ex. 1 at 6. In other words, NARA overlooked that records within the ERO death files that otherwise would not have warranted permanent retention take on new significance as a result of the extraordinary event of a death in ICE custody.

73.     Second, NARA once again ignored researchers' interests in access to the types of primary source materials in the ERO death files, as well as the administrative convenience of having those materials compiled in one place. At least one commenter raised these concerns, stating that the ERO death files "provide a more robust documentation of detainee deaths than

the" OPR death files, and "bring together information from disparate sources, creating a more complete picture of the events surrounding the deaths of individuals in federal custody."  Ex. 6 at 5-6 (quoting comment of Archivists Round Table of Metropolitan New York).  The commenter added that even if some contents of the ERO files "are already scheduled elsewhere, we believe this fragmentation of documentary evidence will place undue and unnecessary burden on the researcher to find and compile information from various places."  *Id.* at 6.  The commenter's concerns echo NARA's own Appraisal Policy, which provides that "NARA may decide to retain records that contain information available elsewhere *in the case of records that are more complete or more easily accessible than the alternative source*."  Appraisal Policy, https://bit.ly/3a4mnNh (emphasis added).  NARA failed altogether to address these concerns.

74.     Finally, at least some valuable contents of the ERO death file are not captured in either the OPR death file or any other permanent record, including without limitation "ERO's corrective action plan based on the OPR report," and "correspondence between ERO and the facility where the detainee died."  Ex. 1 at 6.  Again, NARA did not address this point.

**H.     Failure to Consider Volume of Records**

75.     NARA also failed to provide any assessment of the volume of records at issue, even though its Appraisal Policy calls for such considerations, Appraisal Policy, https://bit.ly/3a4mnNh, and the agency cited "resource considerations" and the "goal of managing the accumulation of federal records" as a reason for not preserving the ICE records permanently, Ex. 6 at 5.  Without any accompanying estimate of the volume of records at issue, that explanation lacks a reasoned foundation.

76.     On information and belief, the complete administrative record—including the over 23,000 public comments NARA received on the proposed ICE Schedule, the vast majority of which are not publicly available online—will reveal additional deficiencies in NARA's approval decision consistent with those identified above.

## PLAINTIFFS' INJURIES

77.     Plaintiffs include two historian associations (AHA and SHAFR), and a government watchdog group (CREW), each of which will be irreparably harmed by any destruction of records pursuant to the ICE Schedule.  These injuries would be redressed by a court order vacating NARA's approval of the ICE Schedule, and enjoining ICE from destroying any records pursuant to that schedule.

78.     As alleged above, AHA is dedicated to sustaining and enhancing the work of historians, including immigration historians.  AHA recognizes that immigration from across the globe is a defining element of the history of the United States that has been vigorously debated since our nation's founding.  AHA is committed to protecting the ability of its members to document and interpret those debates, as well as the policies and practices that have stimulated such conversation.

79.     AHA's members include numerous historians who focus on U.S. immigration issues in their research, scholarship, and teaching.  As part of that work, AHA's members routinely rely on U.S. immigration records—including immigration detention records like those listed in the ICE Schedule—as primary source material, and will continue to rely on such records decades into the future.  AHA's members gain access to these records by, among other things, visiting NARA facilities where the records are stored permanently and through FOIA requests

33

submitted to relevant agencies.  Given the nature of historians' work, AHA members frequently

seek these records many decades after their creation—far beyond the temporary retention periods

set forth in the ICE Schedule.  If the records listed in the ICE Schedule are destroyed, AHA's

members will be irreparably harmed because they will be deprived of current and future access

to critical records on which they routinely rely for their research, scholarship, and teaching.  For

example:

a. AHA member S. Deborah Kang is an Associate Professor of History at California

State University San Marcos.  She specializes in U.S. immigration law and policy,

immigration history, and the U.S.-Mexico border.  Professor Kang has relied

extensively on INS detention records (the predecessors of the ICE records) as part

of her research and educational work, including in her award-winning book *The

INS on the Line: Making Immigration Law on the US-Mexico Border, 1917-1945*

(New York: Oxford University Press, 2017).  That book relied on INS records

documenting the circumstances of detention of Mexican immigrants during the

"Bracero Program" and "Operation Wetback," two of the most important

moments in the history of Mexican immigration and immigration law and policy

in the United States.  Professor Kang gained access to those records by visiting

the National Archives facilities in Washington, D.C., College Park, Maryland,

Fort Worth, Texas, and San Bruno, California.  In keeping with her research

interests, Professor Kang intends to seek and use ICE records, including those

listed in the ICE Schedule, as part of her future work.

b.  AHA member Krystyn R. Moon is Professor of History and Program Director of

American Studies at the University of Mary Washington.  She specializes in the

history of U.S. immigration, ethnicity, and race relations.  Professor Moon has

worked extensively with the Case Files of Chinese Immigrants from NARA's

regional offices and the Correspondence Files of the Immigration and

Naturalization Service (INS), 1903-1959 at NARA's Washington, D.C. location

(Record Group 85), which are the predecessors of ICE's detention records.  In

addition to relying on INS records for research purposes, Professor Moon uses the

records as valuable teaching aids.  For example, she teaches a seminar course

entitled American Immigrant Experience, for which last fall she took students to

the National Archives in Washington, D.C. so they could work firsthand with the

case files of individual immigrants and administrative correspondence found in

Record Group 85.

c.  AHA member Brianna Nofil is a doctoral candidate in U.S. history at Columbia

University.  She specializes in the history of immigration, immigration detention,

and the criminal justice system.  Ms. Nofil has relied on INS detention records

(the predecessors of the ICE records) as part of her research work, including in

her dissertation "Detention Power: Jails, Camps, and the Origins of Immigrant

Incarceration."  This work examines the use of carceral sites in the enforcement of

immigration law, from borderland jails used to enforce the Chinese Exclusion Act

in the 1900s to extraterritorial detention sites created to control Caribbean

migration in the 1990s.  It relies extensively on INS records documenting the

35

conditions of U.S. immigration detention, including records documenting cases of
sexual and physical abuse of incarcerated migrants in contract detention facilities,
and records obtained through FOIA about detainee uprisings and resistance.  In
keeping with her research interests, Ms. Nofil intends to seek and use ICE
records, including those listed in the ICE Schedule, as part of her future work.

80.     As alleged above, SHAFR is dedicated to the study of the history of U.S. foreign
relations.  SHAFR construes the concept of foreign relations history broadly to encompass topics
such as immigration policy, the treatment of migrants, and cross-border mobility.  SHAFR's
members include numerous historians who focus on U.S. immigration issues in their research,
scholarship, and teaching.  As part of that work, SHAFR's members routinely rely on U.S.
immigration records—including detention records like those listed in the ICE Schedule—as
primary source material, and will continue to rely on such records decades into the future.
SHAFR's members gain access to these records by, among other things, visiting NARA facilities
where the records are stored permanently and through FOIA requests submitted to relevant
agencies.  Given the nature of historians' work, SHAFR's members frequently seek these records
many decades after their creation—far beyond the temporary retention periods set forth in the
ICE Schedule.  If the records listed in the ICE Schedule are destroyed, SHAFR's members will
be irreparably harmed because they will be deprived of current and future access to critical
records on which they routinely rely in their research, scholarship, and teaching.  For example:

a.   SHAFR and AHA member Lucy Salyer is Professor of History at the University
of New Hampshire.  She specializes in the history of immigration and citizenship
policies, focusing especially on the Chinese exclusion policy and Asian American

36

citizenship.  Professor Salyer has relied extensively on INS records (the predecessors of the ICE records) as part of her research and educational work, including in her award-winning book *Laws Harsh as Tigers:  Chinese Immigrants and the Shaping of Modern Immigration Law* (Chapel Hill & London: Univ. of North Carolina Press, 1995).  That book relied on INS records documenting the circumstances of the government's detention of Chinese immigrants in California in the early 20th century, including records concerning complaints outside groups submitted to the government about the poor conditions of immigrant detention, and the government's investigation of those complaints.  Professor Salyer gained access to those records by visiting NARA's Record Group 85 in Washington, D.C.

b.  SHAFR and AHA member Jennifer Cullison is a postdoctoral fellow in the Core Humanities program at the University of Nevada, Reno.  She specializes in U.S. history and global issues of race, migration and citizenship, with a particular focus on immigration detention.  Dr. Cullison has relied extensively on immigration detention records of INS and ICE, including in her dissertation "Spawning a Hydra: The Policy and Practice of Immigrant Caging in Postwar America" (filed Spring 2018).  That dissertation explores the growth of immigrant detention writ large in the U.S. since World War II, and includes case studies focused on individual detainee experiences.  Dr. Cullison gained access to immigration detention records by, among other things, visiting the NARA facilities in Washington, D.C., and College Park, Maryland, and through FOIA requests.  In

keeping with her research interests, Dr. Cullison intends to seek and use ICE records, including those listed in the ICE Schedule, as part of her future work.

c. SHAFR member Kristina Shull is a postdoctoral fellow in Global American Studies at Harvard University where she teaches in the Ethnicity, Migration, and Rights unit. She specializes in race, foreign relations, and immigration enforcement, with a particular focus on immigration detention. Dr. Shull has relied extensively on immigration detention records of INS and ICE, including in her current book project, *Invisible Bodies: Immigration Crisis and Private Prisons Since the Reagan Era*, which explores the rise of immigration detention and prison privatization in the early 1980s. Dr. Shull has also relied extensively on ICE records in her collaborations with the non-profit organization Freedom for Immigrants. For example, Dr Shull is the creator of and a frequent contributor to Freedom for Immigrant's IMM Print blog (imm-print.com), a publication of stories from immigration detention that draws heavily from ICE records and data. Dr. Shull has also worked on reports for Freedom for Immigrants that relied on ICE's detention monitoring reports, which are slated for destruction under the ICE Schedule. In keeping with her research interests, Dr. Shull intends to seek and use ICE records, including those listed in the ICE Schedule, as part of her future work.

81. In the view of both AHA and SHAFR, the ICE records scheduled for destruction document a pivotal moment in U.S. immigration policy that is of significant public interest, and have research and historical value comparable to other immigration records NARA has appraised

as permanent, such as those found in NARA's Record Group 85.  Case-specific records

concerning individual immigrants and agency officials, such as the ICE records, provide

immigration historians vital proof of the on-the-ground implementation of our nation's

immigration policy, which often cannot be discerned from higher-level agency records.  The

records also hold unique historic value because ICE is a relatively new agency, having been

established in 2003.  Records from this period will therefore provide critical insight to historians

and researchers as to the operations of a newly formed federal agency, which, as discussed

above, has the been the subject of extensive public criticism and scrutiny with respect to its

treatment of immigrant detainees.  Because these records will serve as essential evidence needed

to piece together the historical record decades into the future, their destruction will inflict

irreparable harm to the work of AHA's and SHAFR's members.

82.     As alleged above, CREW routinely submits FOIA requests to DHS and ICE in

furtherance of its mission of promoting transparency and accountability in government.  CREW

currently has four FOIA requests pending with ICE, and, consistent with its organizational goals,

plans to submit more in the future.  Among those pending requests is a February 25, 2020

request for "all Detention Service Monitor ("DSM") reports" from January 1, 2017 to the present

including "any evaluations, observations, or discussion of ICE facilities' compliance with ICE

detention standards or DHS [OIG] . . . recommendations."  The requested DSM reports are

among the records slated for destruction under the ICE Schedule.  Ex. 5 at 6.  Another pending

request seeks communications from April 1, 2018 to the present between ICE and private prison

operators regarding the "the Trump Administration's zero tolerance and family separation

policies and its expansion of immigration detention."  CREW intends to continue submitting

FOIA requests to ICE for similar records, including records documenting the circumstances of immigrant detention such as those listed in the ICE Schedule.

83.     All Plaintiffs will be irreparably harmed by any destruction of records pursuant to the ICE Schedule.  Because document destruction cannot be undone, it will result in an irretrievable loss of information and, in turn, a permanent hole in the historical record.  And this harm is imminent because, under the ICE Schedule, several categories of records have retention periods as short as three and seven years, meaning ICE will begin destroying those records this year and, indeed, may have already done so.  Thus, the likelihood of irreparable harm will persist unless and until NARA is ordered to withdraw its authorization of disposal authority to ICE, and ICE is enjoined from destroying any records pursuant to the ICE Schedule.

## PLAINTIFFS' CLAIM FOR RELIEF

### Violation of APA – NARA's Approval of the ICE Schedule was Arbitrary, Capricious, an Abuse of Discretion, and Otherwise Not in Accordance with Law

84.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

85.     The APA requires this Court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

86.     Under the FRA, both NARA and ICE share legal responsibilities in establishing records disposition schedules: ICE must "preserve" certain records, 44 U.S.C. § 3101, and propose to NARA the disposal of records in accordance with 44 U.S.C. § 3303, while NARA must scrutinize ICE's proposed disposal schedules to determine whether they comply with 44 U.S.C. § 3101 and § 3303a.

87.     NARA's approval of the proposed ICE Schedule on December 11, 2019 was final agency action under the APA.

88.     NARA's approval of the proposed ICE Schedule was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under the APA for at least the reasons alleged above in paragraphs 48-76, including that NARA:

      a.   Failed to provide a reasoned explanation for its determination that the ICE records lack sufficient research or historical value to warrant permanent retention under the FRA;

      b.   Failed to address significant and relevant public comments it received on the ICE Schedule, and improperly limited many of the comments it did purport to address;

      c.   Failed to consider important aspects of the problem before the agency and relied on factors Congress did not intend it to consider;

      d.   Acted contrary to NARA's own appraisal policies and guidelines, without acknowledging the relevant provisions of those policies and guidelines or explaining why NARA was departing from them;

      e.   Failed to examine the relevant data and articulate a satisfactory explanation for its action; and

      f.   Made findings and conclusions that are not supported by the record.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.     Declare that NARA's December 11, 2019 approval of the ICE Schedule was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law;

2.      Vacate NARA's approval of the ICE Schedule;

3.      Order NARA to withdraw its disposal authorization for the records listed in the

ICE Schedule;

4.      Order ICE not to destroy any records pursuant to the ICE Schedule;

5.      Award Plaintiffs their costs and reasonable attorneys' fees in this action; and

6.      Grant any other relief the Court deems appropriate.


Date: March 16, 2020

*/s/ Nikhel Sus*
NIKHEL S. SUS
(D.C. Bar No. 1017937)
ANNE L. WEISMANN
(D.C. Bar. No. 298190)
Citizens for Responsibility and Ethics in
Washington
1101 K St. N.W., Suite 201
Washington, DC 20005
Telephone: (202) 408-5565
Fax: (202) 588-5020
nsus@citizensforethics.org
aweismann@citizensforethics.org

*Counsel for Plaintiffs*