**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 20-cv-00739 (APM) |
| NATIONAL ARCHIVES AND RECORDS ADMINISTRATION et al., | ) ) ) | |
| Defendants. | ) ) | |

**<u>MEMORANDUM OPINION</u>**

## I.      INTRODUCTION

In December 2019, the National Archives and Records Administration ("NARA") approved a request from U.S. Immigration and Customs Enforcement ("ICE") to schedule the disposal of certain agency records for which ICE no longer had a business use. Plaintiffs have challenged NARA's approval of that request as arbitrary and capricious, an abuse of discretion, and contrary to law. The parties have cross-moved for summary judgment. For the reasons that follow, the court grants in part and denies in part each motion.

## II.      BACKGROUND

### A.      Legal Background

The Federal Records Act provides the legal framework for the collection, preservation, and disposal of records produced by the federal government. As relevant here, the Act requires that federal agencies "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency

. . . to protect the legal and financial rights of the Government and of persons directly affected by the agency's activities."  44 U.S.C. § 3101.  The Federal Records Act entrusts the Archivist, who is the head of NARA, to provide "guidance and assistance to Federal agencies" to ensure that such federal records are properly preserved.  *See id*. § 2904(a).

The Archivist works cooperatively with federal agencies to determine which records an agency must preserve in the archives and which records may be segregated and disposed because of their "temporary value."  *See id.* § 3102(3).  Agency heads request "disposition authority"— permission to discard records—from the Archivist and submit to the Archivist plans to dispose of records that are no longer "needed by [the agency] in the transaction of its current business and that do not appear to have sufficient administrative, legal, research, or other value to warrant their further preservation."  *Id.* § 3303(2).  These plans can include "schedules proposing the disposal" of records that lose their "administrative, legal, research, or other value" over time and do not qualify for permanent retention.  *Id.* § 3303(3).  The Archivist "examine[s] the lists and schedules" and, following a public notice and comment period, determines if any of the records "have sufficient, administrative, legal, research, or other value to warrant their continued preservation."  *Id.* § 3303a(a).

Pursuant to its statutory authority to "establish standards for the selective retention of records of continuing value," *id.* § 2905(a), NARA has promulgated an "Appraisal Policy" that "sets out the strategic framework, objectives, and guidelines that [it] uses to determine whether Federal records have archival value."  Nat'l Archives & Records Admin., Appraisal Policy of the National Archives § 1 (Sept. 2007), https://www.archives.gov/records-mgmt/scheduling/ appraisal#policy [hereinafter Appraisal Policy].  As the Appraisal Policy states:  "Records appraisal is not a rote exercise.  It requires informed judgments, knowledge of and sensitivity to

2

researchers' interests, recognition of resource considerations, and a willingness to acknowledge and understand comments and suggestions from diverse perspectives." *Id.* The Appraisal Policy sets forth how appraisers are to make such informed judgments.

The Policy explains that, as the first step to appraising records, NARA "collect[s] essential evidence from Federal agencies." *Id.* § 6. "Essential evidence" is broken down into three categories: (1) "[r]ecords that document the rights of citizens" and enable citizens "to establish their identities, protect their rights, and claim their entitlements"; (2) "[r]ecords that document actions of Federal officials" and "enable them to explain past decisions, form future policy, and be accountable for consequences"; and (3) "[r]ecords that document the national experience" and "provide the means for evaluating the effects of Federal actions on the nation and for understanding its history, science, and culture, including the man-made and natural environment." *Id.* Not all "essential evidence" requires permanent retention, and "the essential evidence categories" serve merely "as the beginning point for appraisal." *Id.* §§ 6–7.

Sections 7 and 8 of the Appraisal Policy provide guidance on how, within the three categories of essential evidence, NARA identifies records that require permanent preservation. Of the records constituting essential evidence, NARA seeks to permanently retain (1) records whose "importance . . . for protecting legal rights endures despite the passage of time," (2) records "containing significant documentation of Government activities" that are "essential to understanding and evaluating Federal actions," and (3) records that are "essential to understanding the role of the Federal Government and the history of our nation, its people, and the environment." *Id.* § 7. NARA treats these categories as a "high-level strategic framework" for identifying permanent records, and section 8 in turn provides six more granular categories of records that should be permanently retained. *See id.* § 8. These categories include, for example, records that

3

"[r]etain their importance for documenting legal status, rights and obligations of individuals, groups, organizations, and governmental bodies despite the passage of time"; "[p]rovide evidence of significant policy formulation and business processes of the Federal Government"; and "[p]rovide evidence of Federal deliberations, decisions, and actions relating to major social, economic, and environmental issues," among many others. *Id.*

While sections 7 and 8 of the Appraisal Policy provide categories of documents that warrant permanent preservation, those categories are descriptively quite broad, and NARA "uses the general guidelines outlined in Appendix 1" as more concrete criteria for "determining which records support its appraisal objectives and thus warrant permanent retention." *Id.* § 9. Appendix 1 consists of a series of questions that "NARA staff *must* address" in reaching a recommendation to the Archivist. *Id.* app. 1 (emphasis added). The Appendix notes that "[a]pplying the guidelines to specific cases will not be a mechanical process akin to adding up points or checking boxes," but that the guidelines therein are intended to "make decision making easier" and generate "more consistent appraisal judgments." *Id.*

Of significance to this case is Appendix 1's first archival guideline. It asks: "How significant are the records for research?" *Id.* This question, the guidance notes, "is the most difficult variable to determine" because "[w]hat is of relatively low research use today may become of great research use in the future." *Id.* Despite the difficulty of accurately appraising a document's research value, "it is important to consider this question in making appraisal decisions." *Id.* Appendix 1 therefore states that "[i]t is *necessary* to consider the kinds and extent of current research use and to try to make inferences about anticipated use both by the public and by the Government." *Id.* (emphasis added).

4

### B.      Factual Background

The current lawsuit challenges NARA's decision to approve a records disposition schedule for "Detainee Records" (Schedule No. DAA-0567-2015-0013) maintained by ICE (the "Disposition Schedule").

### 1.      ICE's First Proposed Schedule

In October 2015, ICE submitted to NARA a Request for Records Disposition Authority for eleven types of detainee records. *See* J.A. at 646;[1] Pls.' Mot. for Summ. J., ECF No. 9 [hereinafter Pls.' Mot.], Pls.' Mem. in Supp. of Mot. for Summ. J., ECF No. 9-1 [hereinafter Pls.' Br.], at 8. As it pertains to Plaintiffs' challenge, the request sought disposition authority for the following categories of records:

(1)      Sexual Abuse and Assault Files. These "[r]ecords document[] the reporting and investigation of sexual abuse or assault allegations between detainees as well as by employees, contractors, or volunteers against detainees.  Records include, but are not limited to, police reports; summaries of medical exam results; supporting memos and video (if any); evidentiary materials pertaining to the allegation; and investigation outcomes." J.A. at 3.  ICE proposed a 20-year retention period for Sexual Abuse and Assault Files. *Id.* at 648.

(2)      Death Review Files.  These files consist of "[c]omprehensive reports on findings from reviews of circumstances surrounding detainee deaths.  The files include, but are not limited to, investigative reports, correspondence, witness statements, extracts of pertinent information, immigration records, medical records, photographs, video and

---

[1] Citations to "J.A." can be found in the five-volume Joint Appendix, *see* ECF Nos. 19, 19-1, 19-2, 19-3, 19-4.

voice recordings, death certificates, and autopsy reports." *Id.* at 648.  ICE proposed permanent retention of the Death Review Files.  *Id.*

(3)     <u>Detention Monitoring Reports</u>.  Detention Monitoring Reports "document[] on-site monitoring of detention facilities for appropriate and timely resolution of problems and concerns that may arise daily during facility operations." *Id.* at 6.  They are provided weekly by facilities "to the Detention Monitoring Unit" to "identify[] concerns within the facility and corrective actions taken to remedy them." *Id.*  ICE proposed a three-year retention period for Detention Monitoring Reports. *Id.* at 650.

(4)     <u>Detainee Escape Reports</u>.  These reports "document[] details of successful detainee escapes from ICE custody or detention facilities," *id.* at 6, and ICE proposed a seven-year retention period for such records, *id.* at 651.

(5)     <u>Detention Information Reporting Line Records ("DRIL Records")</u>.  DRIL Records "document[] calls to the Detention Reporting and Information Line (DRIL)." *Id.* at 7.  "DRIL is a toll-free service providing a direct channel for individuals in ICE custody, the public, non-governmental organizations, faith-based organizations, academic institutions, attorneys, and advocacy groups to communicate directly with ICE to answer questions and resolve concerns." *Id.*  These "[r]ecords include, but are not limited to, communications in any form (phone, etc.), correspondence, and supporting documentation." *Id.*  ICE suggested a five-year retention period for DRIL Records. *Id.* at 651–52.

(6)     <u>Detainee Segregation Case Files</u>.  These records "document[] the placement of detainees in segregated housing, including reasons for segregation placement, compliance with applicable detention standards, alternative arrangements explored, and

6

assessment of the best course of action." *Id.* at 7.  The records may result from segregation that is "administrative, disciplinary, protective . . . , or self-requested by the detainee." *Id.* ICE included a three-year retention period for Detainee Segregation Case Files. *Id.* at 652.

After ICE submitted the proposed schedule to NARA, NARA offered two comments. First, as to the Death Review Files, NARA appraised the files as "temporary" rather than permanent and recommended that they "be long term temporary, i.e. something in the neighborhood of 50 y[ea]rs." *Id.* at 631.  As NARA's appraiser explained, "These review files may be of interest to individuals and organizations but do not warrant permanent retention in the National Archives because they do not document significant actions of federal officials, the legal rights and interests of US citizens, or the national experience." *Id.*  Second, NARA confirmed with ICE that there were other permanent records that captured "information on sexual assault incidents" in ICE detention. *See id.*; *id.* at 627 (ICE responding that sexual assault incidents are also captured in "the Sexual Assault Case Management System").

ICE thereafter submitted a revised version of its disposition authority request.  The primary change ICE made in this iteration was that it proposed to retain the Death Review Files for 20 years rather than permanently.  Defs.' Cross-Mot. for Summ. J., ECF No. 14 [hereinafter Defs.' Mot.], Defs.' Mem. in Supp. of Defs.' Cross-Mot. for Summ. J. & in Opp'n to Pls.' Mot. for Summ. J., ECF No. 14-1 [hereinafter Defs.' Br.], at 7.

In a four-page appraisal memorandum dated June 20, 2017, the NARA appraiser recommended that the Archivist approve ICE's proposed schedule (the "First Appraisal Memo"). J.A. at 610.  The First Appraisal Memo explained the appraiser's justifications for the approval recommendation.  Importantly here, the Memo contained scant discussion of the research value of the records ICE sought to destroy.  It merely stated that the Death Review Files, Detention

Monitoring Reports, Detainee Escape Reports, DRIL Records, and Detainee Segregation Case Files have "little or no research value." *See id.* at 611–13.  Additionally, the Memo did not include any evaluation or conclusion regarding the research value of the Sexual Abuse and Assault Files and instead justified temporary retention of those files on the basis that they do "not document significant actions of Federal officials." *Id*. at 610.

### 2.    First Notice and Comment Period

In July 2017, NARA published a notice regarding the proposed Disposition Schedule in the Federal Register and requested public comment.  Records Schedules; Availability and Request for Comments, 82 Fed. Reg. 32,585 (July 14, 2017).  NARA received "an unprecedented number of comments"—approximately 25,000 of them—on the proposed Disposition Schedule.  *See* Defs.' Br. at 8; J.A. at 154.  "The general comments received from individuals, organizations, and signers of petitions overwhelmingly asked NARA not to approve the disposition request entirely; not to approve the request to destroy records related to death, abuse, and detainee segregation; or to preserve all records on the pending record schedules."  J.A. at 154.

One of the themes expressed in numerous comments was that the records on ICE's Disposition Schedule were valuable to researchers and thus merited longer or permanent preservation.  *See id.* (noting commenters suggested the records were needed for, among other things, "sociologists and psychologists researching social problems" and "historical research into treatment of detainees and conditions of detention").  As one example of many, 28 congressional representatives signed a letter urging NARA to "err on the side of preservation" of ICE's records. *Id.* at 486.  The representatives argued that preservation was necessary because "the relatively recent government restructuring of our immigration agencies, the increased centrality of immigration in American public debate, and strong congressional attention to this issue indicate

8

that the treatment of immigrants will be of high historical and research value to future scholars and legislators in understanding our country's actions during this moment in time." *Id.* at 485–86. Similarly, the ACLU, which submitted a petition supported by 23,758 comments, *id.* at 154, observed that "[m]any of the records that ICE proposes for destruction have served as the basis for research and literature offering proof of the mistreatment endured by people in detention, including sexual abuse, excessive use of solitary confinement, and death." *Id.* at 494.  The ACLU stressed that "the records in this schedule have significant legal, research and historical value" and "offer a critical window into the treatment of immigrants in the United States." *Id.* at 500–01.

In response to the comments, NARA suggested several revisions to ICE's proposed schedule.  NARA increased the retention period for Sexual Abuse and Assault Files from 20 years to 25 years in order to ensure the records are "preserved for the time required for ICE's business needs." *See id.* at 173.  NARA also split the Death Review Files into two items: a temporary Enforcement and Removal Operations Detainee Death Review File ("ERO Death Review File") with a 20-year disposition and a permanent Office of Professional Responsibility Detainee Death Review File ("OPR Death Review File"). *See id.* at 174.  According to NARA, the two sets of files, named for the separate ICE offices that maintain them, significantly overlap, and "[t]he most significant contents of the ERO Death Review file are covered by the OPR Death Review File." *Id.* at 174–75.  Finally, NARA increased the retention period for DRIL Records from five to seven years to "ensure maintenance of records for an appropriate length of time to ensure legal rights and accountability" and increased the retention period for Detainee Segregation Case Files from three to seven years "to support interests of legal rights and accountability." *See id.* at 178–79.

3.    *Second Notice and Comment Period*

On June 21, 2019, NARA published the modified proposed schedule in the Federal Register and invited a second round of public comments.  *See* Changes to Agency Records Schedule; Request for Comments, 84 Fed. Reg. 29,247 (June 21, 2019).  Once again, NARA received multiple comments expressing concerns that, under the proposed schedule, "sufficient records w[ould] not be available for historical and human rights research."  J.A. at 15.  NARA received, for example, a comment from two professors at Durham University, a public university in the United Kingdom, who had requested in the course of their previous research numerous documents now slated for disposition.  *See id*. at 86–102.  The professors attached their recent research paper based on FOIA requests to ICE detention centers and noted that "[r]esponses to our FOIA requests clearly demonstrate research value for social scientists and legal scholars documenting patterns of behaviour, human rights concerns and abuse in detention."  *Id.* at 86.  According to the professors, "[d]ocuments due for rescheduling are already used in research and are essential to research on US immigration detention facilities."  *Id.* at 87.  Disposing of such records, the professors urged, "would have a demonstrable and negative impact upon academic research in this field."  *Id*.  Similarly, the Archivists Round Table of Metropolitan New York ("ART") commented that many of the records proposed for disposition, including Detainee Segregation Case Files, would be "significant for research for future generations."  *Id.* at 111 (also commenting that "ERO Detainee Death Review Files will be researched by future generations").  ART also emphasized that NARA should carefully consider how preserving summaries of other records sacrificed the "more inclusive perspectives" preserved in original documents.  *See id.* at 110.  For that reason, ART recommended permanently preserving Sexual Abuse and Assault Files, as well as ERO Death Review Files and DRIL Records.  *Id.* at 110–11.

Following the second notice and comment period, NARA published a second consolidated reply to comments.  *See id.* at 14.  NARA acknowledged receiving a number of comments expressing that, "[u]nder the proposed schedule, sufficient records will not be available for historical and human rights research, accountability of ICE employees, to support the legal rights of harmed persons, or family member interest."  *Id.* at 15.  NARA responded to commenters' concerns regarding the research value of the scheduled records by stating, "When the National Archives appraises a series of records as temporary rather than permanent, it does not mean that the activities the records document are unimportant, or that the records lack any research use."  *Id.* at 17.  "Rather," NARA explained, "it means that the anticipated research use will be more contemporary rather than many years into the future."  *Id.*  The agency's conclusion that "anticipated research use will be more contemporary" was the only insight it provided into its consideration of the research value of the records.

NARA also noted that some commenters were concerned that preserving summaries of significant detention events rather than all contemporaneous documentation would not "promote 'inclusive perspectives.'"  *Id.* at 22.  NARA explained that retaining inclusive perspectives was a lesser priority for the agency in selecting which documents to preserve:  "As the archives of the U.S. Government, our policy does in fact consider documentation of high-level federal decision-making more archivally significant than 'inclusive perspectives of all who are involved.'"  *Id.*  Therefore, NARA concluded, "complaints that proceed through agency processes are more . . . likely to meet criteria for permanent retention because they reflect more thorough investigation and assessment."  *Id.*

11

NARA ultimately "approv[ed] the proposed schedule as revised, without further changes." *Id.* at 15. As relevant to Plaintiffs' challenge, the final schedule provides the following retention periods:

| Record | Retention Period |
| --- | --- |
| Sexual Abuse and Assault Files | 25 years |
| ERO Death Review Files | 20 years |
| OPR Death Review Files | Permanent |
| Detention Monitoring Reports | 3 years |
| Detainee Escape Reports | 7 years |
| DRIL Records | 7 years |
| Detainee Segregation Case Files | 7 years |

*Id.* at 3–8.

### C.    Procedural Background

On March 16, 2020, Plaintiffs filed this action under the Administrative Procedure Act ("APA"), alleging that NARA's approval of the ICE schedule was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law. *See* Compl., ECF No. 1. On March 25, 2020, the parties filed a stipulation that ICE would "issue a litigation hold instructing all relevant personnel not to destroy records" subject to the disputed Disposition Schedule. *See* Stip. ¶ 1, ECF No. 5. Thereafter, the parties cross-moved for summary judgment, *see* Pls.' Mot.; Defs.' Mot., and this court heard oral argument on the parties' cross-motions on February 10, 2021.

## II.    LEGAL STANDARD

"[S]ummary judgment is the mechanism for deciding whether as a matter of law an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Louisiana v. Salazar*, 170 F. Supp. 3d 75, 83 (D.D.C. 2016). In reviewing an agency

action under the APA, "the district judge sits as an appellate tribunal," and "[t]he entire case on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotation marks omitted). The court's analysis must be confined to the administrative record and should involve "neither more nor less information than" was before "the agency when it made its decision." *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) (internal quotation marks omitted). The district court's "review is 'narrow' and [it] will 'not substitute [its] judgment for that of the agency.'" *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 605 (D.C. Cir. 2016) (alterations omitted) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.* (*State Farm*), 463 U.S. 29, 43 (1983)).

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). "Although the arbitrary and capricious standard of review is deferential, the court will 'intervene to ensure that the agency has examined the relevant data and articulated a satisfactory explanation for its action.'" *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1221–22 (D.C. Cir. 1999) (alterations omitted) (quoting *Petroleum Commc'ns, Inc. v. FCC*, 22 F.3d 1164, 1172 (D.C. Cir. 1994)). An agency's decision is arbitrary and capricious if the agency relies "on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

## IV.   DISCUSSION

Plaintiffs argue that NARA's approval of ICE's Disposition Schedule was arbitrary and capricious for seven reasons. Specifically, Plaintiffs argue that NARA (1) "failed to sufficiently

evaluate the research value of the ICE records," (2) "failed to address significant and relevant public comments," (3) "disregarded that historical predecessors of the ICE records are archived in NARA's permanent collections," (4) "failed to sufficiently consider the research value of primary material," (5) failed to adequately explain its approval of the "destruction of the ERO detainee death review files," (6) "disregarded NARA appraisal policies on 'periodic reports' in approving destruction of ICE's detention monitoring reports," and (7) "provided no assessment of the volume of records at issue or the cost considerations for long-term maintenance, despite citing 'resource considerations' as a basis for approving the ICE schedule." Pls.' Br. at 18. The court reaches only the first two of these arguments. The court finds that, as to all but the Detainee Escape Reports, NARA's approval of the schedule was arbitrary and capricious on the grounds that NARA failed to evaluate the research value of the ICE records and that NARA failed to address significant and relevant public comments.

Plaintiffs' lead argument centers on the agency's failure to adequately account for the records' research value and to respond to comments raising this inadequacy. Plaintiffs contend that NARA failed to "analyze[] the kinds and extent of current research use of the ICE records by individuals engaged in historical and human rights research" and "to make inferences about anticipated use based on how historians have utilized comparable immigration detention records in the past." Pls.' Br. at 20 (internal quotation marks omitted). They point out that NARA's Appraisal Policy requires the agency to make both inquiries, and that, particularly in light of the fact that the agency "received significant public comments on these points," its failure to do so was arbitrary and capricious. *See id.*

It is black letter law that an agency acts arbitrarily and capriciously when it "entirely fail[s] to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. An agency also must

respond to "relevant" and "significant" public comments.  *Home Box Office, Inc. v. FCC* (*HBO*), 567 F.2d 9, 35 & n.58 (D.C. Cir. 1977).  These two requirements—that the agency consider important aspects of the problem and respond to all relevant and significant public comments— interact to ensure that the agency's decision is responsive to major areas of concern.  Accordingly, "'[t]he failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors.'"  *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) (quoting *Covad Commc'ns v. FCC*, 450 F.3d 528, 550 (D.C. Cir. 2006)).  And, inversely, "[t]he requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result and respond to 'relevant' and 'significant' public comments."  *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) (citation omitted) (quoting *HBO*, 567 F.2d at 35 & n.58).  "[N]either requirement is particularly demanding."  *Id*.

Here, NARA was required by both the governing statutes and the agency's Appraisal Policy to consider the research value of the records in ICE's Disposition Schedule, and it failed to meaningfully do so.  To begin, the Archivist is required by statute to examine schedules submitted by agency heads and determine if "any of the records listed in a list or schedule . . . do not, or will not after the lapse of the period specified, have sufficient administrative, legal, *research*, or other value to warrant their continued preservation by the Government."  44 U.S.C. § 3303a(a) (emphasis added); *see also Am. Friends Serv. Comm. v. Webster*, 720 F.2d 29, 64–65 (D.C. Cir. 1983) (requiring NARA to "provide[] an explanation of what factors were considered in arriving at the conclusion that the records listed do not have sufficient administrative, legal, research, or other value to warrant their continued preservation" (internal quotation marks

omitted)).  Before approving a schedule for disposition, NARA is therefore required to consider as one of several factors whether the records' research value warrants continued preservation.

NARA's Appraisal Policy reflects this statutory mandate.  Under the Appraisal Policy, NARA appraisers "use[] the general guidelines outlined in Appendix 1" to "determin[e] which records support its appraisal objectives and thus warrant permanent retention."  Appraisal Policy § 9.  In turn, Appendix 1 lists questions that "NARA staff *must* address" when "developing appraisal recommendations for the Archivist of the United States."  *Id.* app. 1 (emphasis added). The very first required question each appraiser must address is, "How significant are the records for research?"  *Id.*  To make that assessment, Appendix 1 directs that "[i]t is *necessary* to consider the kinds and extent of current research use and to try to make inferences about anticipated use both by the public and by the Government."  *Id.* (emphasis added).  NARA's obligation to consider the research value of records scheduled for disposition is thus at the forefront of the Appraisal Policy.

The record before this court, however, does not reveal that NARA considered current research use or made inferences about the anticipated use of the documents in future research.  In its appraisal memorandum to ICE, NARA noted that the OPR Death Review Files have "[h]igh potential research value" and that "Congress and the public have shown considerable interest in records of detainee deaths."  J.A. at 176.  But for other files, including Detention Monitoring Reports, Detainee Escape Reports, DRIL Records, and Detainee Segregation Case Files, NARA merely commented that the records have "little or no research value" without providing any analysis of the records' current or anticipated future research use.  *See id.* at 177–78.  What's more, NARA did not provide *any* conclusion as to the research value of the Sexual Abuse and Assault Files.  *Id.* at 172–73.  Without "an 'attempt at explanation or justification'" this court is left with

no means of discerning whether the agency actually considered the research value of the records on ICE's Disposition Schedule.  *See Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 564 (D.C. Cir. 2002) (quoting *Engine Mfrs. Ass'n v. EPA*, 20 F.3d 1177, 1182 (D.C. Cir. 1994)).

NARA, for its part, does not contest that it had to consider the research value of the records on ICE's Disposition Schedule.  Instead, it argues that it was not "required to provide further explanation regarding the documents' research value."  Defs.' Br. at 26.  According to NARA, "potential research value is just one of many factors that informed NARA's decision to approve the Schedule," and "[n]either the APA nor the Appraisal Policy required NARA to specifically address each of these myriad factors in its public explanation of why it approved the Schedule." *Id*.

The court might agree with NARA were it not for the numerous comments touting the current and anticipated future research value of the records and criticizing the agency for not properly measuring their true value.  The court agrees that the steps laid out in the Appendix to the Appraisal Policy do not create some rote, box-checking exercise.  For example, where the lack of research value is self-evident and uncontroverted, it would be unreasonable to demand that the agency provide a fulsome explanation for that conclusion.  But once, as here, NARA receives numerous comments discussing the research value of records in dispute, it has a duty to respond to such comments and to explain its reasoning.  As the D.C. Circuit has noted, "a dialogue is a two-way street: the opportunity to comment is meaningless unless the agency responds to significant points raised by the public."  *HBO*, 567 F.2d at 35–36 (footnote omitted).

During the two notice and comment periods, NARA received specific comments that the Sexual Assault and Abuse Files, ERO Death Review Files, Detainee Segregation Case Files, Detention Monitoring Reports, and DRIL Records possessed significant research value on matters

17

of public interest.  *See* J.A. at 499 (Sexual Assault and Abuse Files); *id.* at 110–11, 496 (ERO Death Review Files); *id.* at 80, 324–25 (Detainee Segregation Case Files); *id.* at 27, 95–96 (Detention Monitoring Reports); *id.* at 111 (DRIL Records).  Rather than grapple with these significant points, NARA summarily answered that the records' "anticipated research use will be more contemporary rather than many years into the future."  *Id.* at 17.  It said no more.  NARA's response is a conclusion, not an explanation of its rationale, and it provides the public—and the court—with no insight into *how* the agency determined that the records had contemporary rather than long-term research value.  NARA did not reference "the kinds and extent of current research use"—a consideration the Appendix deems "necessary"—or explain its "inferences about anticipated use"—which the Appendix states the agency must "try" to make.  *See* Appraisal Policy app. 1.  The D.C. Circuit has made clear that more is required of the agency than "to note the concerns of others and dismiss those concerns in a handful of conclusory sentences."  *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020); *see also Getty v. Fed. Sav. & Loan Ins.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986) (noting that, even where formal findings were not required, "an agency must provide the court an explanation sufficient to allow [it] to properly carry out [its] review").  Accordingly, as to the Sexual Abuse and Assault Files, ERO Death Review Files, Detainee Segregation Case Files, Detention Monitoring Reports, and DRIL Records, NARA's approval of the Disposition Schedule was arbitrary and capricious because it failed to consider an important factor—the research value of the records—and failed to adequately respond to comments pointing out that it had failed to consider that factor.

The court reaches a different conclusion as to the Detainee Escape Reports.  Plaintiffs have not identified—and the court is unaware of—any comments suggesting that the Detainee Escape Reports have significant research value.  *See* Hr'g Tr., ECF No. 20, at 36:6–16 (conceding that,

with respect to the Detainee Escape Reports, "we would not point to specific comments that NARA disregarded as to research value, apart from the generalized objection that we raise concerning the [Significant Event Notification] system").  Because commenters did not specifically identify that NARA failed to appreciate the research value of the Detainee Escape Records, the court concludes that NARA's approval of ICE's Disposition Schedule was not arbitrary and capricious as it pertains to the Detainee Escape Records.[2]  *See Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1150 (D.C. Cir. 2005) ("[A] party will normally forfeit an opportunity to challenge an agency rulemaking on a ground that was not first presented to the agency for its initial consideration.").

The court notes two additional considerations that motivate its decision today.  First, assessing the future research value of records is an inherently difficult and uncertain task, and, as Plaintiffs point out, NARA has previously underestimated the research value of important immigration records.  Pls.' Br. at 28–29.  In 2018, the San Francisco office of NARA published a guide related to Record Group 85, which contains records of the Immigration and Naturalization Service's enforcement of the Chinese Exclusion Act.  *See* Nat'l Archives at S.F., Record Grp. 85, Immigration and Naturalization Service.[3]  The guide notes that "many sought-after records . . . no longer exist" from this time period because "[r]ecords now considered priceless by historians, social scientists, and genealogists were thought by some to have little or no future value fifty years ago."  *Id.* at 3 (emphasis omitted).[4]  The lessons of Record Group 85 provide all the more reason

---

[2] Plaintiffs have not brought any other arguments that NARA's approval of the Detainee Escape Reports specifically was arbitrary and capricious, and the briefing makes little mention of the Detainee Escape Reports in general.  As such, the court concludes that NARA's approval of the portion of the Disposition Schedule addressing the Detainee Escape Reports was not arbitrary and capricious.

[3] Available at: https://static1.squarespace.com/static/5a81dadde9bfdff9a97b0da7/t/5d276e576e392d000188df98/1562865246177/NARA+San+Francisco+District+Inventory+(rev.+12-2018).pdf.

[4] In addition, the San Francisco office of NARA noted that the destruction of some of these records occurred because the Immigration and Nationalization Service "believed at the time, incorrectly, that" many administrative records were

for NARA to carefully consider the future research value of the records listed in ICE's Disposition Schedule.

Second, the court notes that NARA has justified its retention periods for the Sexual Abuse and Assault Files, ERO Death Review Files, Detention Monitoring Reports, and DRIL Records in part on the basis that information contained in those records is "[c]aptured elsewhere" in long-term temporary or permanent records.  J.A. at 173, 175, 177–78.  While the court does not reach Plaintiffs' challenge to these justifications, *see* Pls.' Br. at 30–33, the agency should nonetheless use remand as an opportunity to consider the research value of any primary source material that is not fully captured in other records.  The D.C. Circuit has previously cautioned NARA not to assume that "summaries are always sufficient to maintain all information of value."  *Am. Friends Serv. Comm.*, 720 F.2d at 66 n.61.  "In some cases, summaries cannot be trusted to address all important research issues that may arise . . . ."  *Id.*; *see also id.* at 65 (noting "summaries need to account in some reasonable fashion for historical research interests and the rights of affected individuals").  Accordingly, as NARA considers the research value of the specified records on remand, it should also weigh the research value of any information that is preserved in primary sources but is not captured by secondary summaries or other documents that are permanently preserved.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment, ECF No. 9, is granted in part and denied in part, and Defendants' Motion for Summary Judgment, ECF No. 14, is granted in part and denied in part.  The court vacates NARA's approval of the ICE Disposition

---

summarized or substantially duplicated elsewhere.  Nat'l Archives at S.F., Record Grp. 85, Immigration and Naturalization Service, at 3.

Schedule as to the Sexual Abuse and Assault Files, ERO Death Review Files, Detainee Segregation Case Files, Detention Monitoring Reports, and DRIL Records and remands those portions of the Schedule to NARA for further consideration. The court grants Defendants summary judgment as to the Detainee Escape Reports. A final order accompanies this Memorandum Opinion.

Dated: March 12, 2021

_____
Amit P. Mehta
United States District Court Judge

21